Filed 3/30/21  P. v. Duarte CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>BANI MARCELA DUARTE,<br><br>    Defendant and Appellant. | G058965<br><br>(Super. Ct. No. 18WF0980)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed with directions.

Peter H. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

While heavily intoxicated, Bani Marcela Duarte drove her car at a speed of nearly 80 miles per hour and rammed into another vehicle that was stopped at a red light. The other vehicle was propelled into a pole, caught on fire, and soon was engulfed in flames. Three of the four persons inside, all teenagers, died, despite the efforts of a police officer to rescue them. The fourth teen managed to get himself out of the car alive but suffered burns. Just minutes before these horrifying events occurred, Duarte had driven into a curb, bringing her car to a stop, and had declined offers for a ride by a driver of another car who had observed her driving recklessly and believed she was too drunk to drive.

A jury convicted Duarte of three counts of second degree murder and one count of driving under the influence of alcohol, and found true the allegation of great bodily injury in connection with the last count. Duarte was sentenced to three consecutive indeterminate terms of 15 years to life with a consecutive determinate term of six years, for an aggregate term of 51 years to life.

We reject Duarte's claims of error and affirm. The trial court did not err by denying Duarte's motion to exclude a video recording of a police interview conducted at the scene soon after the fatal collision because Duarte was not in custody at the time for purposes of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). The prosecutor did not commit misconduct by relying on a nonpublished opinion in support of a motion in limine to exclude statistical evidence, and the trial court did not commit misconduct by citing the nonpublished opinion in granting that motion. Any error in citing the nonpublished opinion was harmless, and the trial court did not err by excluding the statistical evidence proffered by Duarte because it was irrelevant. The trial court did not err by denying Duarte's motion to disclose personal juror identifying information because Duarte failed to make a preliminary showing of possible juror misconduct.

2

Finally, we affirm the restitution fine and victim restitution. The abstract of judgment for the indeterminate prison commitment does not accurately reflect the trial court's sentence waiving the court security fee and the criminal conviction assessment, and, therefore, we shall direct the trial court to prepare a corrected abstract.

## FACTS

### I.

### The Fatal Collision

On the night of March 28, 2018, Duarte drove her car to a restaurant to have dinner with a friend. At about 11:00 p.m., Duarte and her friend went to a bar and, at about 11:30 p.m., walked across the street to another bar.

At about 1:00 a.m. on March 29, Esteban Espinosa, Eric Martinez, and Alex Martinez were in a car, driven by Espinosa, heading toward Huntington Beach from Newport Beach. Espinosa noticed that a white car was swerving between lanes and had nearly hit several parked cars. The white car sped past them on the right hand side, pulled in front of them, struck a curb, and came to a stop. Espinosa pulled up next to the white car and parked. The driver of the white car, later identified as Duarte, got out and looked toward Espinosa. He could see she was intoxicated: Her speech was impaired, she burped, and she struggled to walk. Espinosa and Alex Martinez asked Duarte if she was "okay." She said yes. Espinosa offered three or four times to give her a ride "to wherever she was going." Duarte declined the offers and got back into her car.

Espinosa drove his vehicle in front of Duarte's car and parked. Alex Martinez called 911 to report the incident. About five minutes later, Duarte drove around Espinosa and sped off. Espinosa and his friends followed her, all the while Alex Martinez stayed on the line with the 911 operator.

As Duarte drove northbound on Pacific Coast Highway, she continued to swerve between lanes and drove recklessly at about 80 miles an hour in a 55 mile per

3

hour zone.  Duarte maintained the same high rate of speed as she approached a red traffic light. Stopped at the red light was a Toyota automobile.  Inside the Toyota were four teenagers:  Brooke Hawley, Albert Rossi, Dylan Mack, and Alexis Vargas Andrade.

Duarte drove her car smack into the rear of the Toyota.  The force of impact was so great that it propelled the Toyota into a traffic pole.  The Toyota caught on fire.[1]  Espinosa, who had followed Duarte to the scene, ran toward the Toyota to try to help the victims inside, but he stopped when his friends told him the situation was too dangerous.

Police officers arrived within minutes.  Huntington Beach police detective Sean McDonough used his flashlight to break the front driver's side window of the Toyota, reached inside the car, and tried to open the door to rescue those inside.  The car door had been badly damaged and would not open.  The flames were growing and McDonough could feel them burning his uniform.  He tried to douse the flames with a fire extinguisher, but it was of little use.  The fire grew stronger and soon the vehicle was engulfed in flames.  Firefighters arrived and extinguished the fire.

Hawley, Rossi, and Mack died inside the car.  The cause of death was extensive thermal injuries and/or carbon monoxide inhalation.  Vargas Andrade, who had been in the front passenger seat, managed to get out of the car alive.  He suffered

---

[1]  As these events unfolded before his eyes, Alex Martinez related them to the 911 operator.  The transcript of the 911 call is chilling.  Once Martinez and his friends had crossed the bridge over the Santa Ana River and entered Huntington Beach, the operator asked Martinez if the car they were following was still swerving.  Martinez told the operator, "[o]h fuck. . . .  She just hit a car.  She just hit a car."  Moments later Martinez reported, "[o]ne of the cars is on fire. [¶] . . . [¶] . . . the car is on fire right now."  The operator asked Martinez if he had seen what had happened; he replied, "[y]eah, she hit a car in front of her" that was stopped at a red light.  He begged the operator, "Hurry, please.  The car is on fire and there's still people trapped inside."  As Martinez watched the flames grow, he told the operator, "[t]hey're still in there. [¶] . . . [¶] . . . it's lighting up. [¶] . . . [¶] Oh shit."  Finally, he exclaimed, "The car's on fire, man.  Holy shit."

extensive burns to his hair and a hand.  He was found after the crash in a state of shock: He did not know what had happened or how he had gotten out of the car.[2]

## II.

## Police Investigation

Huntington Beach police officers interviewed Duarte at the scene.  At first, she told them she did not know how much alcohol she had consumed that night or how she collided with the victims' car.  She later stated she had started drinking at about 11:00 p.m. and drank perhaps three alcoholic drinks.  She refused to take a breathalyzer test at the scene or participate in a field sobriety test.

The officers arrested Duarte and her blood was drawn at 2:45 a.m. on March 29, 2018.  Her blood alcohol concentration was .28 percent; at 1:00 a.m., the time of the collision, her blood alcohol concentration would have been .30 or .31 percent. Inside Duarte's car, police investigators found a partially empty one-ounce bottle of vodka, an empty 24-ounce can of malt liquor, and an empty, broken Styrofoam cup.

Police investigators found tire skid marks in the intersection.  The event data recorder from Duarte's car showed it had traveled at nearly 79 miles per hour for the last half second before the collision.  The event recorder for the Toyota showed it had been fully stopped for about two seconds before the collision.  The brakes in Duarte's car had not been activated in the five seconds before the collision.

## III.

## Duarte's Prior Arrest and Instagram Posts

At about 3:40 a.m. on June 22, 2016, Orange County Sheriff's Deputy Jeremy Johnson made a traffic stop of a Ford Expedition driven by Duarte.  The interior of the vehicle smelled of alcohol, and Duarte's eyes were watery.  Johnson asked Duarte if she had been drinking; she replied that she had been drinking in a bar earlier in the

---

[2]  At trial, Vargas Andrade testified the only thing he remembered about the collision was "waking up."  He still had no idea how he got out of the car.

evening. Duarte submitted to a breathalyzer test which showed a blood alcohol concentration that was higher than the legal limit to drive a motor vehicle.

Johnson read Duarte her rights pursuant to *Miranda, supra*, 384 U.S. 436, confiscated her driver's license, and placed her under arrest for driving under the influence (DUI). Inside Duarte's vehicle, Johnson found an empty beer can, an empty bottle of vodka, and a water bottle containing an alcoholic beverage. Duarte was issued a citation and her driver's license was suspended for a year, however, it appears she was not prosecuted for this offense.[3]

In November 2017, Duarte posted an Instagram message stating, "don't drink and drive." At about the same time, she responded to an Instagram message about a collision caused by a drunk driver by posting that she had used a rideshare service the previous weekend to avoid driving while under the influence. Duarte advised, "rather be safe than sorry." She also posted an Instagram message stating: "Well, I was pretty messed up. I fall asleep when I'm drunk LOL."

## DISCUSSION

### I.

#### The Trial Court Did Not Err by Denying Duarte's Motion to Exclude the Video Recording of the Police Investigation

Immediately after the fatal collision, Huntington Beach police officers Daniel Kim and Roman Altenbach questioned Duarte for about an hour. The interview was video recorded by means of a body-worn camera. Duarte moved to exclude the video recording on the ground she was in custody when interviewed but had not been read her rights pursuant to *Miranda, supra*, 384 U.S. 436. The trial court denied Duarte's

---

[3] There is no evidence in the record that Duarte ever received the advisement based on *People v. Watson* (1981) 30 Cal.3d 290 (*Watson* advisement) that "[i]f you continue to drive while under the influence of alcohol or drugs, or both, and, as a result of that driving, someone is killed, you can be charged with murder." (Veh. Code, § 23592, subd. (a).)

motion to exclude the video recording, it was received into evidence as exhibit 5, and it was played for the jury. A transcript of the video recording was received into evidence as exhibit 5A and copies of the transcript were given to the jurors.

Duarte argues the trial court prejudicially erred by denying her motion to exclude the video recording of the on-scene police interview. We disagree. Although Duarte does not mention the transcript (exhibit 5A), we conclude it was admissible too.

A. *Background: The On-scene Investigation*

Officer Kim began questioning Duarte while she was still seated in her car after the collision. Kim started by asking Duarte her name, where she had been, in which direction she had been traveling, and where she had been. After answering a few questions, Duarte said she wanted to go home. She told the officers she lived in San Clemente and asked if they could take her there. When asked how much she had had to drink, Duarte said she did not know. She also said she did not know whether she had been driving.

Kim asked Duarte more generally what had happened. She said she wanted to go home and asked if she was going to jail. Kim replied, "I don't know. We haven't determined that yet." Kim asked Duarte for her driver's license, vehicle registration, and proof of insurance. Duarte was surprised to learn that she had been in an accident and that her car had been totaled. Kim informed Duarte the interview was being recorded because he was conducting an investigation, "an investigation we need to do."

Officer Altenbach took over the investigation. He had Duarte step out her car and escorted her to the sidewalk. Altenbach told Duarte he was going to conduct a "little investigation" to make sure she was not too impaired to drive. He then asked questions about her medical conditions, when she last slept, and when and what she had last eaten. Duarte asked why he was asking those questions. Altenbach replied, "it's just part of our investigation into what happened." Duarte acknowledged that she had been

7

driving but said she was not going to drive anymore. She asked if she was going to get a ticket. Altenbach said he did not know because he was still investigating the accident and did not yet know if she had done anything wrong. When Altenbach questioned Duarte about what she had had to drink that night, she gave various answers and asked, "Why do I have to say it?" Altenbach responded, "Well I can't force you to answer but I'm asking the question. [¶] . . . [¶] . . . I'm doing an investigation to see if you're impaired enough or too impaired to drive."

Duarte again said she wanted to go home and asked Altenbach to take her there. He said he would not do that. She asked why. He replied: "Because you're being detained per my investigation. [¶] . . . [¶] . . . [B]ecause some of the things I'm seeing lead me to believe you might be impaired so I'm going to do my investigation." He continued, "[s]o you're not free to leave and we're going to do our investigation, okay?"

Altenbach again asked Duarte how much she had had to drink, when did she start drinking, where had she been drinking, at what time had she stopped drinking, and what medications, if any, had she taken. Duarte refused to let Altenbach check her eyes. He told her he could not force her to comply and repeated that statement moments later.

The investigation was halted while paramedics examined Duarte. Altenbach stepped back while paramedics spoke with her. The paramedics told Duarte that she needed to be checked at a hospital, and one paramedic told her "we're going to bring a backboard over here and put you on that and then get you transported, sound good?" Duarte asked if she should go to the hospital. A paramedic replied, "yeah[,] . . . [i]t'd be advisable to get checked out by a doctor and then . . . they'll do the rest of it at the hospital." Duarte denied having injuries and declined to be taken to the hospital.

When the investigation resumed, Altenbach tried to conduct field sobriety tests on Duarte but she declined to participate and declined to take a breathalyzer test.

8

Several times she said that she wanted to go home. At the close of the investigation, Altenbach arrested Duarte for DUI.

B. *Legal Principles and Circumstances Relevant to Determining Whether a Suspect Is in Custody*

In reviewing a trial court's ruling on a motion to suppress based on a *Miranda* violation, the appellate court accepts the trial court's resolution of disputed facts and inferences, as well as credibility evaluations, if supported by substantial evidence. (*People v. Thomas* (2011) 51 Cal.4th 449, 476.) The appellate court independently determines from the undisputed facts and facts properly found by the trial court whether the challenged statement was obtained in violation of *Miranda*. (*People v. Thomas, supra*, at p. 476.)

In *Miranda*, the United States Supreme Court held that the Fifth Amendment privilege against self-incrimination prevents the prosecution from using statements obtained from a defendant during a custodial interrogation unless the prosecution demonstrates "the use of procedural safeguards effective to secure the privilege." (*Miranda, supra*, 384 U.S. at p. 444.) Suspects in police custody must be told they have a right to remain silent, anything they say may be used against them in court, and they are entitled to the presence of an attorney, either retained or appointed, at the interrogation. (*Thompson v. Keohane* (1995) 516 U.S. 99, 107.) "The purposes of the safeguards prescribed by *Miranda* are to ensure that the police do not coerce or trick captive suspects into confessing, [and] to relieve the "'inherently compelling pressures'" generated by the custodial setting itself, "'which work to undermine the individual's will to resist.'"" (*Berkemer v. McCarty* (1984) 468 U.S. 420, 433, italics omitted, fn. omitted (*Berkemer*).) The prosecution may not use statements obtained in violation of *Miranda* to establish guilt. (*Id*. at p. 428.)

*Miranda* warnings are required only when a defendant is subject to a custodial interrogation. (*Stansbury v. California* (1994) 511 U.S. 318, 322 (*Stansbury*);

9

*Miranda, supra*, 384 U.S. at pp. 444, 478-479.) Thus, a defendant must have been in custody at the time of the interrogation in order to assert a *Miranda* violation. (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 35.)

A suspect is in custody when placed under arrest or when a reasonable person in the suspect's position would believe his or her "freedom of action is curtailed to a 'degree associated with a formal arrest.'" (*Berkemer, supra*, 468 U.S. at p. 440; see *People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) This is an objective test. (*Stansbury, supra*, 511 U.S. at p. 323; *People v. Leonard, supra*, at p. 1400.) In determining whether a defendant was in custody when no formal arrest has been made, a court must examine all the circumstances surrounding the interrogation. (*Stansbury, supra*, at p. 322.) These circumstances include (1) the length of the detention, (2) the location of the detention, (3) whether the suspect was the focus of the investigation, and (4) whether any indicia of arrest was present. (*People v. Moore* (2011) 51 Cal.4th 386, 395; but see *Stansbury, supra*, at p. 326 [whether the interrogating officers have focused their suspicions on the person being questioned is not relevant for purposes of *Miranda* if those suspicions are undisclosed].) The subjective views of the officers present are not considered. (*Stansbury, supra*, at p. 323.)

Other relevant factors include the ratio of police officers to suspects, whether the suspect was told he or she could terminate the questioning, whether the officers told the suspect he or she was considered a witness or suspect, whether the suspect's freedom of movement was restricted during the interrogation, whether the officers dominated or controlled the interrogation or were aggressive, confrontational, or accusatory, whether the officers pressured the suspect, and whether the suspect was arrested at the end of the interrogation. (*People v. Bejasa, supra*, 205 Cal.App.4th at p. 36.)

Application and assessment of the various indicia of custody have led the United States Supreme Court to conclude that detention and questioning of a driver

10

subsequent to a routine traffic stop do not constitute a custodial interrogation. (*Berkemer, supra*, 468 U.S. at pp. 435, 437-440. "[D]etention of a motorist pursuant to a traffic stop is presumptively temporary and brief." (*Id.* at p. 437.) In *Berkemer*, a highway patrol officer stopped a car after observing it weave in and out of a lane. (*Id.* at p. 423.) The defendant had difficulty standing when he got out of the car. (*Ibid.*) Without advising the defendant of his *Miranda* rights, the officer asked him whether he had been using intoxicants. (*Ibid.*) The defendant said he had two beers and smoked marijuana a short time before. (*Ibid.*) The officer placed the defendant under arrest. (*Ibid.*)

The United States Supreme Court concluded the defendant's prearrest statements were admissible because the defendant was not in custody within the meaning of *Miranda* until he was placed under arrest. (*Berkemer, supra*, 468 U.S. at p. 442.) A short period of time elapsed between the initial traffic stop and the arrest, only one officer was present, that officer asked the defendant a modest number of questions, the questioning was in a public spot that was visible to passing motorists, and although the officer made the decision to arrest the defendant as soon as he stepped out of the car, the officer did not tell the defendant he would be placed in custody. (*Id.* at pp. 441-442.) "Treatment of this sort," the Supreme Court concluded, "cannot fairly be characterized as the functional equivalent of formal arrest." (*Id.* at p. 442.)

*Pennsylvania v. Bruder* (1988) 488 U.S. 9, 9-11 presented facts similar to those of *Berkemer*. The United States Supreme Court concluded that "*Berkemer*'s rule, that ordinary traffic stops do not involve custody for purposes of *Miranda*, governs this case." (*Pennsylvania v. Bruder, supra*, at p. 11.)

C. *Duarte Was Not in Custody for Purposes of* Miranda

The video recording of the investigation (exhibit 5) and its transcript (exhibit 5A) are part of the record on appeal. The facts are undisputed. We conclude,

11

after considering all the relevant circumstances, Duarte was not in custody for purposes of *Miranda* before her formal arrest.

The evidence established that Duarte had been subject to the equivalent of an investigation subsequent to a traffic stop. Kim and Altenbach did not pull over Duarte; however, as the trial court correctly stated, "that doesn't make a difference. She is there." Kim and Altenbach arrived at the scene of a fatal collision and found Duarte seated behind the steering wheel of her car. The air bag had been deployed. The car was severely damaged. It was reasonable to suspect that Duarte had been driving while under the influence of alcohol and might have had something to do with the collision. As the trial court concluded, "a DUI investigation doesn't equal in custody for *Miranda* purposes."

An immediate investigation was necessary and, naturally enough, the officers wanted to know whether Duarte had been drinking and to get her explanation about what had just happened. "'When circumstances demand immediate investigation by the police, the most useful, most available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation . . . and enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.'" (*People v. Davidson* (2013) 221 Cal.App.4th 966, 968.)

The investigation was about an hour long, which was no longer than necessary given the circumstances. Duarte argues the length of the investigation made it a custodial interrogation, but the law does not set any time limit on the permissible length of a detention. "'[T]he law contemplates that the officer may temporarily detain the offender at the scene for the period of time *necessary to discharge the duties* that he incurs by virtue of the traffic stop.'" (*People v. Tully* (2012) 54 Cal.4th 952, 980, italics added.) In the present case, the length of the investigation was due primarily to the difficulty in getting Duarte to provide answers to even the most basic questions. She

12

rambled, provided inconsistent answers, and constantly meandered off the topic of questioning. In addition, a sizeable part of the time reflected on the video recording showed the intervention by the paramedics, who examined Duarte and urged her to go to the hospital to be checked. (See *People v. Forster* (1994) 29 Cal.App.4th 1746, 1753-1754 [detention of more than one hour did not establish the defendant was in custody because the length was "rationally explainable"].)

Duarte argues the area of the investigation, apparently along or on Pacific Coast Highway, had been closed off to the public and a number of police vehicles blocked entry and exit. True that might be, but the location of the investigation was an open area, not a police interrogation room, and was in plain view of other police officers, firefighters, and paramedics.

Two officers were present, but only one officer interacted with Duarte at any given time. Kim asked questions for a while, then turned the investigation over to Altenbach. The two officers never spoke with Duarte at the same time.

Although Duarte was the focus of the investigation into the cause of the fatal crash, neither Kim nor Altenbach ever told her that. Whenever she asked why she was being questioned, they responded that it was part of the investigation into what had happened or that it was necessary to determine whether she was too impaired to drive. There were no indicia of arrest: Duarte was never restrained or handcuffed.

Other factors demonstrate there was no *Miranda* violation. Duarte was never told she had to answer questions. To the contrary, Altenbach told Duarte she did not have to answer questions and did not have to have her eyes examined, participate in the field sobriety test, or take a breathalyzer test. Duarte's freedom of movement was never restricted: She could walk freely, was never restrained, and was allowed to sit on a curb. She was given the option of being taken by paramedics to a hospital, even encouraged to do so, but declined.

13

The officers did not dominate the investigation. Neither Kim nor Altenbach was aggressive, confrontational, or accusatory. Duarte was asked whether she was the driver of the car, but that is not necessarily an accusatory question. (See *People v. Bellomo* (1992) 10 Cal.App.4th 195, 199.) The video recording demonstrates the officers, both in their words and their actions, were professional, courteous, and reserved; indeed, as the trial court remarked, "the officers were very cordial to her." When the paramedics spoke with Duarte, the officers backed away. The officers placed no pressure on Duarte: They never forced her to answer questions or take the field sobriety or breathalyzer test. When Duarte said she was cold, they brought her jacket to her. The trial court found the atmosphere of the investigation was not coercive, and substantial evidence supports that finding.

Duarte emphasizes the officers' statements that she could not leave as proof she was in custody. The officers justifiably told Duarte she could not leave because they were conducting an investigation. In any case, she could not have driven away because she was intoxicated and her car was severely damaged. The officers did not restrain her movement so she could have walked away if she were able.

In sum, a reasonable person in Duarte's position would not have believed that during the police investigation her freedom of action was curtailed to a degree associated with a formal arrest. (*Berkemer, supra*, 468 U.S. at p. 440.) Duarte was not in the least coerced, tricked, or pressured, and the officers did nothing that might have undermined her will to resist. (*Id.* at p. 433.) The trial court therefore did not err by denying Duarte's motion to exclude the video recording, and both the recording and the transcript were properly admitted into evidence.

## II.

### There Was No Prosecutorial Misconduct, Judicial Misconduct, or Prejudicial Error in Connection with Exclusion of Duarte's Statistical Evidence

Duarte argues the prosecutor committed misconduct by citing a nonpublished opinion in support of a motion in limine to exclude her statistical evidence on the relationship between DUI arrests and DUI fatalities. She argues the trial court committed misconduct by relying on that nonpublished opinion and erred by granting the prosecution's motion in limine. We conclude there was no misconduct, any error in citing the nonpublished opinion was harmless, and the trial court did not err by granting the motion to exclude the statistical evidence.

A. *Background*

The prosecution brought a motion in limine to exclude "statistical evidence of the relationship between arrests for DUI, DUI fatalities, and the natural and probable consequence that DUI is dangerous to human life." In support of the motion, the prosecution cited *People v. Gandarilla* (Feb. 22, 2011, G042743) (nonpub. opn.).

At the hearing on the motion in limine, the trial court asked defense counsel, "[i]s the defense looking to get into statistics with a witness?" Counsel responded: "I think the case law kind of says I can't on some grounds. What I really want to explore with the witnesses is their experiences with DUI arrests and their experiences with DUI fatalities." The court asked for an offer of proof. Defense counsel responded: "Their knowledge base. I believe Mr. Page will come in and testify as an expert. He is going to testify as relates to the accident scene. He is going to give measurements and talk about diagrams." The prosecutor explained that Joshua Page would be called as an expert witness to testify about the "collision sequence" and his examination of the road after the fatal collision.

15

The trial court granted the motion in limine. The court stated: "I don't believe that statistical evidence would be probative in this case. If anything, under 352, it would tend to confuse and mislead the jury. They're going to be given a menu on the implied malice, and the jury will need to decide whether the menu has been proven based on all the evidence, which would include direct and circumstantial evidence. [¶] . . . [¶] Sure, maybe one out of a hundred DUI's resulted in death, but what does that have to do with this case? The jury is going to get the menu on second degree murder. And the [district attorney] has the big burden of proving up this whole knowledge requirement. I just don't think it's a proper topic for this case." In reaching this conclusion, the trial court cited *People v. Gandarilla, supra*, G042743.

Duarte explains the nature and theory of relevance of the statistical evidence in the appellant's opening brief. She states she wanted to present evidence that "only a very small number of DUI's result in fatalities" and therefore her prior DUI arrest would not have made her aware that a high probability of death would result from driving while intoxicated.

B. *Neither the Prosecution nor the Trial Court Committed Misconduct*

A nonpublished appellate opinion "must not be cited or relied on by a court or a party in any other action," except in limited circumstances not relevant here. (Cal. Rules of Court, rule 8.1115(a), (b).) The trial court should not have relied on *People v. Gandarilla, supra*, G042743, and the prosecutor should not have cited it.

Duarte, by failing to object, forfeited any claim of misconduct or error by the prosecutor or the trial court. "To avoid forfeiture of a claim of prosecutorial misconduct, a defendant must object and request an admonition." (*People v. Perez* (2018) 4 Cal.5th 421, 450.) "As a general rule, a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320.) In the present case, an objection would have cured any

16

harm caused by the citation to a nonpublished opinion because the trial court would have been alerted not to consider it.  (See *People v. Hoyt* (2020) 8 Cal.5th 892, 952.)

But there was no prosecutorial error.  A prosecutor's conduct violates the federal constitution when the conduct "'infects the trial with such unfairness as to make the conviction a denial of due process'"; that is, when the conduct is "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  (*People v. Harrison* (2005) 35 Cal.4th 208, 242.)  A prosecutor's conduct that does not render a criminal trial fundamentally unfair under federal law violates California law only if the conduct involves "'"'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'"  (*Ibid*.)

Here, the prosecutor's citation to a single nonpublished opinion in a motion in limine did not infect the entire trial with unfairness or deny Duarte a fair trial.  A claim of prosecutorial error therefore must be founded on state law.  The prosecutor's citation to the nonpublished opinion, though not permitted by the California Rules of Court, was not deceptive or reprehensible.

We firmly reject Duarte's claim that the trial court committed misconduct by citing the nonpublished opinion.  A legal error or an erroneous ruling does not in itself constitute judicial misconduct.  (Rothman et al., *Cal. Judicial Conduct Handbook* (4th ed. 2017) § 3:46, pp. 192-193.)  Legal error constitutes judicial misconduct only when the error "clearly and convincingly reflects" bad faith, bias, abuse of authority, disregard for fundamental rights, intentional disregard of law, or "any purpose other than faithful discharge of judicial duty."  (*Oberholzer v. Commission on Judicial Performance* (1999) 20 Cal.4th 371, 398; see Rothman et al., *Cal. Judicial Conduct Handbook, supra*, §§ 3:47, 3:48 at pp. 195-196.)  The trial court's citation of the nonpublished opinion did not reflect any of those traits; indeed, in every aspect of this case, the trial judge acted with the utmost integrity, respect for the law, and regard for the rights of everyone involved.

17

C. *Any Error in Citing the Nonpublished Opinion Was Harmless*

The trial court's citation to the nonpublished decision is subject to the general rule that a conviction will not be reversed unless the error resulted in a miscarriage of justice, that is, the error was prejudicial. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 835-837.) Citing a nonpublished opinion violates nonstructural state law—California Rules of Court, rule 8.1115—and therefore prejudice is considered under the standard of *People v. Watson, supra*, at p. 836. (See *People v. Gonzalez* (2018) 5 Cal.5th 186, 195; *People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) Under the Watson standard, reversal is required only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson, supra*, at p. 836.)

The rule is the same for prosecutorial misconduct. A conviction will not be reversed for prosecutorial misconduct based on state law unless the misconduct resulted in prejudice, that is, "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

In this case, any error in citing or relying on the nonpublished opinion was harmless because, had that opinion never been cited by the prosecution, there would have been no reasonable probability the trial court would have allowed Duarte to present the statistical evidence. Without the nonpublished opinion, the trial would have reached the same conclusion and granted the prosecution's motion in limine for the reason that the statistical evidence proffered by Duarte was irrelevant.

Duarte argues the statistical evidence was relevant to the issue of implied malice. She argues, first, that evidence would have "tended to refute the objective element of implied malice requiring the jury to find that Duarte committed an act, the natural consequences of which were dangerous to human life." She argues, second, that the statistical evidence was "relevant to the jury's consideration of the subjective

18

elements of implied malice which required the prosecutor to prove that Duarte knew her act was dangerous to human life and deliberately acted with conscious disregard for human life."

Duarte was charged with, and convicted of, three counts of implied malice murder. Malice is implied when the defendant deliberately engaged in conduct the natural consequences of which were dangerous to life, the conduct proximately caused the death of another, the defendant knew that the conduct would endanger the life of another, and the defendant acted with conscious disregard for life. (*People v. Knoller* (2007) 41 Cal.4th 139, 143.) Implied malice murder has a physical (objective) component and a mental (subjective) component. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181; *People v. Knoller, supra*, at pp. 153-154.) The physical component is the defendant performs an act the natural consequences of which are dangerous to life. (*People v. Chun, supra*, at p. 1181.) The mental component is the defendant knows that his or her conduct endangers the life of another yet acts with conscious disregard for life. (*Ibid.*)

The statistical evidence proffered by Duarte was not relevant to either component of implied malice. Whether or not a small number of DUI arrests results in fatalities has no bearing on whether the natural consequences of driving while intoxicated are dangerous to life. Looking solely at the ratio between DUI arrests and DUI fatalities ignores the overall danger and risk presented by drunk drivers. It is virtually self-evident that a natural consequence of driving while intoxicated is a danger to human life: "[O]ur observation that '[drunken] drivers are extremely dangerous people' [citation] seems almost to understate the horrific risk posed by those who drink and drive." (*Burg v. Municipal Court* (1983) 35 Cal.3d 257, 262.)

The mental component of implied malice could only have been determined by consideration of evidence of Duarte's own knowledge and understanding. Whether or not statistics showed that a small number of DUI arrests results in fatalities has no

19

bearing on whether Duarte knew her conduct endangered the lives of others and acted in conscious disregard of life. The trial court said it succinctly and best: "[s]ure, maybe one out of a hundred DUI's resulted in death, but what does that have to do with this case?"

The legal validity of our analysis, as well as that of the trial court, does not depend for legal validity upon the nonpublished opinion cited by the prosecution. The proffered statistical evidence was inadmissible under fundamental principles of relevance as applied to the components of implied malice. The trial court reached the conclusion the statistical evidence would not be probative and engaged in an analysis under Evidence Code section 352 before citing the nonpublished opinion. Duarte cites no authority that would have made the statistical evidence admissible.

Thus, there is no reasonable probability that, had the prosecution never cited the nonpublished opinion, the trial court would have denied the prosecution's motion in limine and admitted the statistical evidence. Because there was no reasonable probability that the ruling on the motion in limine would have been different, there was no reasonable probability the jury would have reached a verdict more favorable to Duarte if the prosecution and the trial court had not cited the nonpublished opinion.

D. *The Trial Court Did Not Err by Excluding the Statistical Evidence*

The trial court did not err by granting the prosecution's motion in limine and excluding the statistical evidence. Only relevant evidence is admissible. (Evid. Code, § 350.) We have concluded the statistical evidence proffered by Duarte was irrelevant to any issue presented at trial.

The trial court engaged in an analysis under Evidence Code section 352. Because the proffered statistical evidence had no relevance, its probative value was substantially outweighed by the probability that its admission would necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.)

20

In addition, defense counsel's offer of proof at trial did not advance a theory or identify evidence of a preliminary fact by which a foundation would have been laid to make the statistical evidence admissible.  (Evid. Code, §§ 400, 402, 403.)  Defense counsel said he wanted to "explore" statistics with the witnesses, but the only witness identified was Page, the prosecution's accident reconstruction expert.  Defense counsel did not identify any defense witness who would be able to testify about the statistics.  Defense counsel never described what statistics he wanted to present other than to say they concerned the witnesses' "experiences with DUI arrests and their experiences with DUI fatalities."  The failure of the offer of proof alone justified the trial court's decision to exclude the statistical evidence.  (Evid. Code, § 403, subd. (a).)

**III.**

**The Trial Court Did Not Err by Denying Duarte's Motion
to Disclose Personal Juror Identifying Information**

Duarte argues the trial court erred by denying her motion to disclose personal juror identifying information.  We find no error.

A.  *Background*

About two months after the jury rendered its verdicts, Duarte filed a motion to disclose personal juror identifying information pursuant to Code of Civil Procedure section 237, subdivision (b).  The motion was based on a letter the trial court had received from one of the jurors after the verdicts had been rendered.  Duarte argues the letter demonstrated the juror had felt intimidated and ignored during deliberations and had, at a minimum, been "bullied" into voting to convict Duarte of murder.

A redacted version of the letter was submitted with the motion.  In the letter, the juror stated that Duarte's case was the first time the juror had been chosen to serve on a jury, the trial was difficult, and the juror was exhausted when deliberations started.  The juror then described the course of deliberations:  "Within a very short period

21

of time, most of the jurors started to say that she was guilty.  Many expressing their feeling about getting in a car drunk.  Her knowing what she was doing was wrong.  That she was acting when she was crying in the video.  After many people had expressed their feelings, I had to speak up.  I said 'It sounds to me like you are all going off of emotion.  This is the exact thing that the judge told us not to do.  Do you not remember him saying that we had to have the ingredients to the recipe??'  Another jury spoke up and said and the totem pole, remember what he said about that?  A couple of jurors agreed about the recipe and said that we have the elements to prove the verdict."

The letter relates that the jurors discussed the elements of implied malice.  All the jurors but the letter writer and another agreed that the acting with conscious disregard of life element of implied malice had been met.  The juror who wrote the letter asked about the *Watson* advisement.  A discussion followed, and "it came down to telling me it was not necessary to convict the defendant."  The juror expressed the belief that Duarte did not get in the car with the intent to kill anyone.  Other jurors made comments, and one juror said "it had something to do with intentional intoxication."  The juror also expressed self-doubt:  "I had so many things going through my head . . . .  What was wrong with me??  I knew I listened but maybe I missed something important.  How could I be the only one holding out?"

The letter continued:  "I told everyone that I didn't mean to be difficult.  I just wasn't on the same page as everyone else.  I said maybe you need to educate me a little more or I really need to read more.  I read the instructions on the juror process and the elements that were needed to convict the defendant of murder.  I still just didn't see it.  I remember reading a paragraph after the four elements, and it somehow swayed me a little bit.  I kept reading the elements and just wanted it to jump out at me, what everyone else was agreeing on.  After what seemed a long time for me, I raised my hand.  I raised it because I felt like I missed something."

22

The juror wrote, "I felt wrong about the whole thing" and "wished I had written [the trial court] a note" during the deliberations to ask if a prior *Watson* advisement were necessary for a later murder conviction. The juror concluded by writing: "I never imagined all of the pressure that a juror feels in the deliberation room" and "I just had to write to you to get this off of my conscience."

The trial court denied the motion to disclose personal juror identifying information on the ground that Duarte had not made a prima facie showing of good cause for disclosure. The court stated it had read the juror's letter "many, many times line for line word for word," the letter showed the juror was an active participant in the deliberation process, and "[n]owhere in the letter does the juror state improper interaction or coercion with the other jurors." The jury was polled after the verdict, and all jurors confirmed the verdict as theirs.

The trial court concluded: "So there is absolutely nothing in that letter that would suggest anything that comes close to jury misconduct. . . . At no time does she mention being bullied, ignored, forced[,] intimidated, coerced. [¶] If anything, it's the opposite. She took an active role."

B. *Duarte Failed to Show Good Cause*

A trial court's record of the jurors' personal identifying information must be sealed after the verdict is recorded. (Code Civ. Proc., § 237, subd. (a)(2).) "Pursuant to [Code of Civil Procedure] Section 237, a defendant or defendant's counsel may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (*Id.*, § 206, subd. (g).) A petition for access to personal juror identifying information must be "supported by a declaration that includes

23

facts sufficient to establish good cause for the release of the juror's personal identifying information."  (*Id.*, § 237, subd. (b).)

Good cause to support a petition to disclose juror personal identifying information based on juror misconduct means a showing that is sufficient to support a reasonable belief that juror misconduct occurred.  (*People v. Cook* (2015) 236 Cal.App.4th 341, 345-346.)  "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported."  (*Ibid.*)  "'Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information.'"  (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 990.)  Denial of a petition for access to personal juror identifying information is reviewed under the abuse of discretion standard.  (*People v. Jones* (1998) 17 Cal.4th 279, 317; *People v. Johnson* (2013) 222 Cal.App.4th 486, 492.)

The trial court did not err because Duarte failed to provide a showing sufficient to support a reasonable belief that juror misconduct had occurred during deliberations.  As the trial court concluded, the juror's letter did not state or suggest that the juror who wrote the letter had been intimidated, forced, or coerced into voting to convict.  The letter does not state or suggest that improper deliberations had occurred or the jurors reached their verdicts by chance or other improper means.  The letter reveals that the jurors did precisely what they were supposed to do during deliberations:  They reviewed the evidence, read and studied the instructions, expressed their thoughts, and debated points of disagreement.  The juror who wrote the letter had actively participated in deliberations and nothing in the letter suggests that her views had been ignored or that she was shunned or marginalized.

In the letter, the juror wrote of her struggle to reach a decision and the pressure she felt during the deliberation process.  Those feelings are normal, not signs of

misconduct.  Jury trials can be difficult and exhausting for jurors, particularly in cases with facts like this one.  Deliberations can be pressure-filled and stressful; jurors often struggle to reach a decision.

Duarte argues the juror's statement in the letter that she "felt wrong about the whole thing" is an acknowledgment that juror voted to convict based on "perceived pressure to conform to what the other jurors believed."  The trial court viewed the letter as an expression of "buyer's remorse" rather than a revelation of misconduct.  The court's assessment was a fair one.  The juror agreed with the verdicts and, when polled, confirmed the verdicts were hers.  Whatever the juror might have subjectively felt during deliberations, access to personal juror identifying information is permissible only upon a showing of possible juror misconduct, and no such showing was made by Duarte.

**IV.**

**The Restitution Fine and the Victim Restitution Are
Affirmed; the Abstract of Judgment Must Be Corrected
to Strike the Court Security Fee and the
Criminal Conviction Assessment**

The following fine, fee, assessment, and restitution award appear on the abstract of judgment for the indeterminate prison commitment:  $300 restitution fine (Pen. Code, § 1202.4, subd. (b)(1)); $160 court security fee (*id*., § 1465.8, subd. (a)(1)); $120 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)); and $26,585.37 in victim restitution (Pen. Code, § 1202.4, subd. (f) (section 1202.4(f)).  Duarte argues all of these must be stricken pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1172-1173 (*Dueñas*) because she does not have the ability to pay them.

A.  Dueñas *Is Inapplicable to Victim Restitution Under Section 1202.4(f)*

The *Dueñas* court held that due process of law requires a trial court to determine a defendant's "present ability to pay" before imposing court security assessments, criminal conviction assessments, and restitution fines.  (*Dueñas, supra*, 30

25

Cal.App.5th at pp. 1164, 1169-1172.) Assuming for purposes of this opinion only that *Dueñas* was correctly decided, we conclude *Dueñas* is inapplicable to victim restitution under section 1202.4(f).

*Dueñas* addressed restitution fines under Penal Code section 1202.4, subdivision (b), which are paid to the court. Here, the trial court awarded $26,585.37 in victim restitution under section 1202.4(f). *Dueñas* did not address direct restitution to the victim. In *People v. Evans* (2019) 39 Cal.App.5th 771 (*Evans*) the Court of Appeal concluded the rule of *Dueñas* did not extend to victim restitution under section 1202.4(f) because victim restitution is paid directly to the victims as compensation for economic losses caused by the defendant's criminal conduct. (*Evans, supra,* at p. 777.) A criminal defendant's ability to pay victim restitution is not a factor to consider in setting a restitution award under section 1202.4(f) because victim restitution is enforceable as a civil penalty and the wealth of a defendant in a civil action is irrelevant to liability. (*Evans, supra*, at pp. 776-777.)

Several courts have adopted the reasoning of *Evans* and its conclusion that *Dueñas* does not extend to victim restitution under section 1202.4(f). (*People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 859; *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 338; *People v. Allen* (2019) 41 Cal.App.5th 312, 326.) We agree with these opinions and likewise conclude that *Dueñas* does not extend to victim restitution under section 1202.4(f).

B. *The Abstract of Judgment Must Be Corrected by Striking the Court Security Fee and the Criminal Conviction Assessment*

At sentencing, defense counsel asserted that Duarte was indigent and asked the trial court to waive "the fines and fees." In response, the trial court waived the court security fee (Pen. Code, § 1465.8, subd. (a)(1)) ($40 per count, $160 total) and the criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)) ($30 per count, $120 total) and found that Duarte did not have the ability pay. The court imposed the

26

restitution fine (Pen. Code, § 1202.4, subd. (b)(1)) in the minimum amount of $300. The court stated the record would show that Duarte had made a *Dueñas* motion. The sentencing minutes also reflect that the court security fee and the criminal conviction assessment had been waived.

However, the abstract of judgment for the indeterminate prison commitment includes the court security fee and the criminal conviction assessment that the trial court had waived. The oral pronouncement of sentence controls over the abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) The appellate court has inherent power to order correction of the abstract of judgment if it does not accurately reflect the oral judgment of the court. (*Ibid.*) The Attorney General does not argue the abstract correctly reflects the trial court's decision on the court security fee and the criminal conviction assessment, or that fee and assessment must be imposed notwithstanding the trial court's decision to waive them. We therefore direct the trial court to correct the abstract of judgment for the indeterminate prison commitment by striking the court security fee of $160 and the criminal conviction assessment of $120.

Duarte also challenges the $300 restitution fine. We conclude the trial court did not err by imposing that fine. If a defendant has been convicted of a felony, a trial court has discretion to set the restitution fine in an amount of not less than $300 or more than $10,000. (Pen. Code, § 1202.4, subd. (b)(1).) The trial court in the present case imposed the minimum, and confirmed that amount after making a finding on Duarte's ability to pay. This was a reasonable decision considering, as the court put it, "I could have given her up to $10,000."

If the trial court erred by imposing the $300 restitution fine, the error was harmless beyond a reasonable doubt because Duarte will be able to earn enough in prison wages while incarcerated to pay it. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035; *People v. Johnson* (2019) 35 Cal.App.5th 134, 140; see (*People v. Cervantes* (2020) 46

27

Cal.App.5th 213, 229 [Defendant's ability to pay includes the ability to obtain prison wages and to earn money after his release from custody].)

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the abstract of judgment for the indeterminate prison commitment by striking the $160 court security fee and the $120 criminal conviction assessment, prepare a corrected abstract of judgment, and forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


FYBEL, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.